UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

                Plaintiff,               No. 15-cr-20218

vs.                                Hon. Gerald E. Rosen

DONNELLE ULYSSES FONVILLE,

                Defendant.

_____/

OPINION AND ORDER REGARDING
<u>DEFENDANT'S MOTION TO SUPPRESS EVIDENCE</u>

At a session of said Court, held in
the U.S. Courthouse, Detroit, Michigan
on September 09, 2015

PRESENT:  Honorable Gerald E. Rosen
                United States District Chief Judge

## I. <u>INTRODUCTION</u>

Defendant Donnelle Fonville was indicted by the Grand Jury on a one-count indictment for violation of 18 U.S.C. § 922(g)(1), "Felon in Possession of a Firearm Following Convictions for Three Serious Drug or Violent Felony Offenses." The charges against Fonville arise from a *Terry* stop and subsequent pat-down search conducted by Washtenaw County Sheriff's Deputies in the early morning hours of January 24, 2015. During the search, a gun was found in the pocket of Fonville's pants.

On June 15, 2015, through counsel, Fonville filed the instant Motion to Suppress

Evidence in which he seeks to suppress the gun and all other evidence seized from him, and statements he made subsequent to his arrest.  The basis for this motion is Fonville's claim that the sheriff's deputies who detained and searched him did not have a reasonable suspicion that he was engaged in criminal activity so as to justify stopping and searching him.  Fonville further claims that because the officers lacked a reasonable individualized suspicion of his involvement in illegal activity at the time of his stop, his arrest which resulted from evidence seized during the stop was not supported by probable cause.  He also claims that statements taken from Fonville subsequent to his arrest should also be suppressed because they were obtained following this allegedly illegal arrest.

On July 29, 2015, the Court conducted an evidentiary hearing on the matter, at which it heard the testimony of Washtenaw County Deputy Sheriffs Samuel Wallace and Ahmed Morsey, as well as the testimony of Defendant Fonville.  The Court also viewed and listened to the audio of the deputies' patrol car video from January 24, 2015.   At the conclusion of the hearing, the Court took the matter under advisement.

Having now had the opportunity to review and consider the parties' briefs, the arguments of counsel, the testimony and the evidence submitted at the hearing held on July 29, 2015, and the Court's entire record of this matter, the Court is now prepared to rule on Defendant's Motion.  This Opinion and Order sets forth the Court's ruling.

## II.  PERTINENT FACTS

Shortly before 1:00 a.m., the morning of January 24, 2015, Washtenaw County

Sheriff's Deputies Samuel Wallace and Ahmed Morsey were dispatched to the Elks' Lodge on Ecorse Road in Ypsilanti, Michigan based on a 911call reporting that a large crowd of approximately 200 people were causing a disturbance at the Lodge, and that they were fighting and refusing to leave. The dispatcher further related to the deputies, both orally and then digitally via the MDC computer monitor mounted in the patrol car, that the 911 caller had said that one of the persons involved in the disturbance, who was possibly wearing a red jacket, might have a gun. A call-back number for the caller was included in the MDC dispatch.

Both of the deputies were familiar with the Elks' Lodge and knew it to be associated with criminal activity. Both Wallace and Morsey testified that the Elks' Lodge is located in a high crime area and that they both had responded to the Lodge on several previous occasions for complaints of fighting and gun-related violence, including in response to shootings there within the past year.

Deputies Wallace and Morsey were the third patrol unit to arrive at the Lodge the morning of January 24, 2015. While en route to the Lodge, the officers received reports from officers already on the scene that no physical fighting was occurring outside the building. When Wallace and Morsey arrived, they observed numerous cars in back of the building and in the adjacent lot. They also saw a number of persons exiting the Lodge and heading toward the parking lot, and could see that several cars were beginning to leave the area.

Deputy Wallace parked the patrol car on North Harris Street, which is on the west side of the Lodge.  The video camera mounted in the patrol car was working and was equipped with audio.  The video camera was mounted in a fixed position and faced outward so that it recorded only activity directly in front of the patrol car.  However, the audio also picked up sound from the officers' body microphones when they were out of the car.  Deputy Morsey exited the squad car first, and proceeded on foot to the northwest corner of Harris and Ecorse to observe people exiting the Lodge; Deputy Wallace proceeded to the east to scan the back parking lot.

A short while later, Deputy Wallace spotted a person (later identified as Defendant Fonville) wearing a red Adidas jacket who was 10 to 15 yards from where the patrol car was parked.  Both Wallace and Morsey testified that they did not see anyone else in the parking area wearing a red jacket.  Since the 911 dispatch had included information that a person wearing a red jacket might be armed with a gun, Wallace immediately notified Deputy Morsey of the presence of this person.[1]

---

[1] The patrol car video showed another individual possibly wearing a reddish-colored fleece jacket entering a car that had stopped 15 to 20 feet in front of the patrol car.  However, nothing in the video or audio or any other evidence presented to the Court suggests that the officers ignored the presence of this other individual and instead decided to target Defendant, as there is no evidence indicating that the officers ever saw this person; they were not in the patrol car while the video camera was running, and nothing indicates that they were positioned such that they should have seen what is shown on the video.  Furthermore, it is not entirely clear from the grainy video image that the jacket the person seen entering the car was, in fact, red, as the video was picking up the red flashing of patrol car flashers which the deputies testified were kept on after they had exited their patrol car and were also operating on all of the other parked patrol cars that had arrived at the Elks' Lodge.

When Deputy Wallace spotted him, Fonville had his back to Wallace, and was on the driver's side of another car parked facing the same direction as the patrol car, talking to the female driver. Deputy Wallace approached Fonville from the front of the car and asked to talk to him. Deputy Morsey meanwhile approached from the rear. According to Wallace, after he called out to Fonville and asked to talk to him, Fonville stood upright and said, "You talking to me? What's going on? Why you messing with me?" Wallace testified that Fonville's speech was slurred, and he was having difficulty keeping his balance. Wallace said that when he got within arms' reach of Fonville he smelled alcohol on his breath.

Wallace told Fonville, "You're not under arrest; I just need to talk to you." Fonville started to walk away and stumbled backwards -- right into Deputy Morsey. Morsey caught Fonville around his hips. Morsey testified that he, too, smelled alcohol on Fonville. Both deputies testified that Fonville tensed up, pulled his arms to his chest, turned toward the unoccupied car that parked along side the car with the female driver and leaned into the other car, trying to keep the right side of his body pinned against the car. The deputies each testified that, in their experience, this was not a typical response from someone merely being asked questions: Morsey testified it was the typical response of someone who does not want contact with the police and that he viewed Fonville's body tensing as indicative that he might try to flee or otherwise resist; Wallace testified that in his experience Fonville's actions indicated that he was trying to hide something.

5

Defendant Fonville does not dispute that he was trying to evade Deputies Morsey and Wallace.  In response to questions posed at the hearing, Fonville admitted that he had been drinking and that his speech was slurred when he spoke to the deputies.  He further admitted he kept trying to keep his body pinned against the car so they could not search him.  He testified, "I was drunk.  I was on parole.  I had a pistol and I knew I couldn't have a gun.  That's why I was trying to get away."

After Deputy Morsey steadied Fonville, he grabbed Fonville's left hand and told him to stop tensing up.  Deputy Wallace testified that when Deputy Morsey grabbed Fonville's left hand, he observed Fonville's right hand go down to his waistband.  This caused Wallace concern that he might have a weapon.

Because of everything the deputies had observed of Fonville to this point, they decided a pat-down search was necessary.  Fonville, however, actively resisted being patted-down.  According to Deputy Morsey, when he began to pat Fonville down, he pulled his arms toward his chest and would not cooperate.  Morsey, therefore, pushed Fonville onto a parked car and attempted to handcuff him, for safety, so he could be patted down.  With Deputy Wallace's assistance, the two officers finally got Fonville in handcuffs, but he continued to tense up and conceal the front part of his body by keeping it pinned to the parked car.

With Fonville in that position, Deputy Morsey was only able to pat down Fonville's left side and did not feel anything that resembled a weapon.  He got Deputy

Wallace to pat down Fonville's right side.  Wallace did so and soon called out indicating he had found a gun.  Fonville then began to thrash around, so Morsey sat him down on the ground, and after he was seated, Wallace removed a silver .9mm Sig Sauer handgun with five live rounds in it from Fonville's right front pants pocket.

The deputies then walked Fonville to their patrol car.  Once Fonville was placed in the patrol car, a LEIN search was done which showed that Fonville did not possess a Concealed Pistol License ("CPL") and that he was a convicted felon currently on parole. Fonville was then told that he was under arrest.

At 1:10 a.m. the deputies departed the Elks' Lodge with Fonville and drove to the Washtenaw County Jail.  During the drive, Fonville managed to make calls on his cell phone which had not been confiscated during the search.  The audio tape from the patrol car picked up Fonville telling someone on the phone that "they caught me with a pistol."

A criminal background query of Fonville through NCIC was subsequently conducted.  This query revealed that Fonville had no fewer than five Michigan felony convictions in the past ten years:  In 2005, Fonville was convicted in Washtenaw County Circuit Court on charges of delivery or manufacture of marijuana; in 2006, he was convicted on two counts of larceny from the person; in 2007 he was convicted for delivery or manufacture of a narcotic less than 50 grams; and in 2008, he was convicted for possession of a narcotic less than 25 grams and for assaulting, resisting and obstructing a police officer.  It was also subsequently determined that the Sig Sauer found

on Fonville had not been not manufactured in the State of Michigan.[2] [*See* Criminal Complaint and Affidavit of AFT Special Agent Ted Crews, Dkt. # 1.]

On April 9, 2015, the Grand Jury returned the one-count felon-in-possession Indictment presently pending before the Court.

## III.   DISCUSSION

A law-enforcement officer's stop and frisk of an individual -- though potentially brief in duration -- infringes upon the suspect's liberty and thus constitutes a search and seizure for Fourth Amendment purposes.  *See  Terry v. Ohio*, 392 U.S. 1, 16 (1968) ("[W]henever a police officer accosts an individual and restrains his freedom to walk away, he has 'seized' that person. And ... a careful exploration of the outer surfaces of a person's clothing all over his or her body in an attempt to find weapons is ... a 'search.'").

It is well-settled, however, that police may briefly stop an individual for investigation if they have a "reasonable suspicion" that the individual has committed a crime.  *Terry v. Ohio*, 392 U.S. 1, 28, 88 S.Ct. 1868, 1883 (1968);*United States v. Shank*, 543 F.3d 309, 312 (6th Cir. 2008)*; Houston v. Clark County*, 174 F.3d 809, 813 (6th Cir. 1999).  In *United States v. Sokolow*, 490 U.S. 1 (1989), the Supreme Court held that "reasonable suspicion" entails only "some minimal level of objective justification" for making an investigative stop -- that is "something more than an inchoate and unparticularized suspicion or 'hunch', but less than the level of suspicion required for

---

[2]  Coincidentally, the Sig Sauer turned out to be among several firearms that had been reported stolen from a residence in Ypsilanti on October 26, 2010.

probable cause." *Id.* at 7.  According to the Sixth Circuit,

> Reasonable suspicion is "more than an ill-defined hunch; it must be based
> upon a particularized and objective basis for suspecting the particular
> person ... of criminal activity." *Houston*, 174 F.3d at 813 (alterations in
> original) (internal quotations and citation omitted). It requires "'specific and
> articulable facts which, taken together with rational inferences from those
> facts, reasonably warrant' an investigatory stop." *Id.* (quoting *Terry v. Ohio*,
> 392 U.S. 1, 21, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)). Moreover,
> reasonable suspicion "can arise from evidence that is less reliable than what
> might be required to show probable cause." *Id.*

*United States v. Shank, supra*, 543 F.3d at 312 (quoting *Weaver v. Shadoan*, 340 F.3d

398, 407 (6th Cir.2003)).  *See also, United States v. Hurst*, 228 F.3d 751, 757 (6th Cir.

2000) ("While an officer making a *Terry* stop must have more than a hunch, 'reasonable

suspicion' is considerably less than proof of wrongdoing by a preponderance of the

evidence.")  Reasonableness is measured in objective terms by examining the totality of

the facts and circumstances within the officers' knowledge at the time of the stop.  *Terry*

*v. Ohio, supra*, 392 U.S. at 21-22, 88 S.Ct. at 1879-80.

The requirement that law enforcement officers demonstrate a "reasonable

suspicion" of criminal activity, however, applies only if a person is "seized," *see United*

*States v. Williams*, 615 F.3d 657, 663 (6th Cir. 2010) (citing *Bennett v. City of*

*Eastpointe*, 410 F.3d 810, 821 (6th Cir.2005)), and officers do not seize people "merely

by approaching individuals on the street or in other public places and putting questions to

them." *Id.,* quoting *United States v. Drayton*, 536 U.S. 194, 200, 122 S.Ct. 2105, 153

L.Ed.2d 242 (2002).  "Obviously, not all personal intercourse between policemen and

citizens involve seizures of persons."  *Terry v. Ohio*, 392 U.S. 1, 20 n. 16, 88 S.Ct. 1868.

An investigatory stop subject to the requirements of *Terry* and its progeny "occurs when police use some form of coercion:  Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a seizure has occurred." *Id.*  (internal quotation marks omitted).

At what point in time in Fonville's encounter with the sheriff's deputies, then, was he "seized"?  *See United States v. Freeman*, 735 F.3d 92, 96 (2d Cir. 2013) ("As an initial matter, we must first determine when exactly the police seized Freeman. . . ."); *United States v. Lowe*, 791 F.3d 424, 430 (3d Cir. 2015) ("In assessing the legality of a *Terry* stop, we must first pinpoint the moment of the seizure. . . .").  *See also United States v. Beauchamp*, 659 F.3d 560, 567 (6th Cir. 2011) (holding that it was only after the defendant had indicated that he did not want to speak with the police by walking away two times that a reasonable person would not have felt free to walk away a third time after an officer had given him express instructions to do otherwise).  It is this point in time that is critical because it is only what happens *after* the seizure that cannot be considered in assessing whether the stop is justified by a sufficiently reasonable articulable suspicion of a crime.  *Freeman, supra*.

The Sixth Circuit considers the following factors as evidence of a seizure:  "'the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled.'"  *United States*

*v. Campbell*, 486 F.3d 949, 954 (6th Cir.) (quoting *United States v. Mendenhall*, 446 U.S. 544, 554, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980) (opinion of Stewart, J.)), *cert. denied*, 552 U.S. 1083 (2007).  There is, however, no bright line rule.

In *Williams, supra,* the court stated

"[I]n order to determine whether a particular encounter constitutes a seizure, a court must consider all the circumstances surrounding the encounter to determine whether the police conduct would have communicated to a reasonable person that the person was not free to decline the officers' requests or otherwise terminate the encounter." *Florida v. Bostick*, 501 U.S. 429, 438, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991); *see also Michigan v. Chesternut*, 486 U.S. 567, 573–74, 108 S.Ct. 1975, 100 L.Ed.2d 565 (1988) (stating that an individual is seized if "a reasonable person would have believed that he was not free to leave" and noting that the test is an objective one (internal quotation marks omitted)). In addition, an individual must actually submit to the show of authority to be seized within the Fourth Amendment. *California v. Hodari D.*, 499 U.S. 621, 626, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991); *United States v. Jones*, 562 F.3d 768, 774–75 (6th Cir.2009).  For this reason, "a consensual encounter does not amount to a seizure." *United States v. Campbell*, 486 F.3d 949, 954 (6th Cir. 2007).

615 F.3d at 663 (footnote omitted).

Defendant Fonville takes the position that he was seized from the moment of his initial contact with Deputy Wallace.  Defendant's position is not supported by the record.  Quite the contrary, the facts adduced through the sworn testimony of the deputy sheriffs and the documentary and video evidence submitted at the July 29, 2015 hearing establish that Deputy Wallace's initial contact with Fonville did *not* constitute a seizure.

When he was approached by Deputy Wallace, Fonville did not face the threatening presence of several officers; rather Wallace was alone when he initially

11

approached Fonville, while Fonville was talking to the woman in the car.  Wallace was

not brandishing or displaying a weapon. He merely approached Fonville and said, Hey,

my man, come talk to me," and then, when Fonville asked, "Are you talking to me?",

Wallace stated, "You're not under arrest.  I just need to talk to you."

An individual is not seized when an officer approaches him and asks to talk to

him.  *See e.g.,United States v. Peters*, 194 F.3d 692, 694, 698 (6th Cir.1999), *cert.*

*denied*, 528 U.S. 1174 (2000) (defendant not seized when officer approached and asked

whether he could speak with him); *United States v. Moore*, 675 F.2d 802, 808 (6th

Cir.1982), *cert. denied*, 460 U.S. 1068 (1983), (DEA agent did not seize defendant when

he approached him and inquired "Can I ask you a few questions").  He is not seized even

when he is approached by more than one uniformed officer, *see United States v. Frazier*,

936 F.2d 262, 265 (6th Cir.1991) (defendant not seized when two agents approached and

inquired whether they could ask him some questions), or questioned by uniformed

officers surrounding him on both sides, *see United States v. Smith*, 594 F.3d 530, 539

(6th Cir. 2010); *but see United States v. Johnson*, 620 F.3d 685, 690-91 (6th Cir.2010)

(holding that a reasonable person would not feel free to leave when two officers arrived

separately in marked police cars and ordered defendant to stop); *United States v. Smith*,

*supra* (holding that although defendant was not initially seized when uniformed officers

asked him questions while surrounding him on both sides, after he started to walk away

and one of the officers asked him to stop, a reasonable person would not feel free to

12

leave); *Northrop v. Trippett*, 265 F.3d 372, 380 (6th Cir.2001), *cert. denied*, 535 U.S. 955 (2002) (holding that a reasonable person would not feel free to leave when, after defendant sought to leave the area, one officer directed another officer to stop him and the officers asked him to produce identification).

Fonville obviously did not feel like he was not free to leave as he, in fact, started walking away from Deputy Wallace.  Even if Deputy Wallace's appearance on the scene (in uniform) constituted a show of authority, by walking away from the deputy, Fonville obviously did not submit to that show of authority. "[T]here is no seizure without actual submission; otherwise, there is at most an attempted seizure, so far as the Fourth Amendment is concerned." *Brendlin v. California*, 551 U.S. 249, 254, 127 S.Ct. 2400 (2007); *see also California v. Hodari D.*, 499 U.S. 621, 626 n. 2, 111 S.Ct. 1547 (1991); *United States v. Smith, supra*.

It was not until after Fonville had started to walk away from Deputy Wallace and stumbled, and Deputy Morsey "hip checked" him and grabbed his left hand that a "seizure" occurred.  Thus, all information available to the deputies before this point in time can be considered in assessing whether they had a reasonable articulable suspicion of criminal activity.

Fonville argues that the anonymous 911 call which provided the deputies with the information about an individual in a red jacket possibly having a gun should not be considered or should be given only minimal weight in assessing whether the deputies had

13

a reasonable suspicion justifying the stop and frisk.  In support, he relies principally upon *Florida v. J.L.*, 529 U.S. 266, 120 S.Ct. 1374 (2000).

In *J.L.*, the Miami Police Department received a phone call from an anonymous caller in which the caller stated that a young black male standing at a particular bus stop and wearing a plaid shirt was carrying a gun.  There was no audio recording of the call and there was no information concerning the identity of the informant.  Two officers were instructed to respond.  The officers arrived at the bus stop about six minutes later and saw three black males "just hanging out" there.  One of the three, J.L., was wearing a plaid shirt.  The officers did not see any firearm, and J.L. made no threatening or otherwise unusual movements.  One of the officers approached J.L., ordered him to put his hands up, frisked him and seized a gun from his pocket.  (The other officer frisked the other two against whom no allegations had been made and found nothing.)

J.L. was subsequently charged under Florida state law with carrying a concealed firearm without a license and possessing a firearm while under the age of 18.  The state trial court granted J.L.'s motion to suppress the gun as the fruit of an unlawful search. The intermediate appellate court reversed, but the Florida Supreme Court quashed the decision finding that there was insufficient indicia of reliability in the anonymous tip to furnish police with a reasonable suspicion that the J.L. might be engaged in criminal activity and, accordingly, held the search invalid under the Fourth Amendment.  The U.S. Supreme Court agreed.

The Court acknowledged that "there are situations in which an anonymous tip, suitably corroborated, exhibits 'sufficient indicia of reliability to provide reasonable suspicion to make [an] investigative stop.'"  529 U.S. at 270, 12 S.Ct. at 1378.  By way of example, the Court pointed to the anonymous tip discussed in *Alabama v. White*, 496 U.S. 325, 110 S.Ct. 2412 (1990).  In *White*, the police received an anonymous tip that a woman who was carrying cocaine would leave a certain apartment building at a certain time and drive to a named motel.  The *J.L.* Court stated that standing alone, this tip would not have justified a *Terry* stop.  It was "[o]nly after police observation showed that the informant had accurately predicted the woman's movements...did it become reasonable to think the tipster had inside knowledge about the suspect and therefore to credit his assertion about the cocaine."  *J.L.*, 529 U.S. at 271, 12 S.Ct. at 1378 (citing *White*, 496 U.S. at 332).

In *J.L.*, however, the Court found lacking the indicia of reliability present in *White:*

> The anonymous call concerning J.L. provided no predictive information and therefore left the police without means to test the informant's knowledge or credibility.  That the allegation about the gun turned out to be correct does not suggest that the officers, prior to the frisks, had a reasonable basis for suspecting J.L. of engaging in unlawful conduct.  The reasonableness of official suspicion must be measured by what the officers knew before they conducted their search.  All the police had to go on in this case was the bare report of an unknown, unaccountable informant who neither explained how he knew about the gun nor supplied any basis for believing that he had inside information about J.L.

***

An accurate description of a subject's readily observable location and appearance is reliable in this limited sense: It will help the police correctly identify the person whom the tipster means to accuse. Such a tip, however, does not show that the tipster has knowledge of concealed criminal activity. The reasonable suspicion here at issue requires that a tip be reliable in its assertion of illegality, not just its tendency to identify a determinative person.

*Id.*, 529 U.S. at 271-72, 120 S.Ct. at 1379.

Accordingly, the Court held that "an anonymous tip lacking indicia of reliability of the kind contemplated in . . . *White* does not justify a stop and frisk whenever and however it alleges possession of a firearm." *Id.* at 274, 120 S.Ct. at 180.[3]

―――――――――――――

[3] In his concurring opinion in *J.L.*, Justice Kennedy highlighted that a tipster's predicting of future conduct as found in *White* is not the only way an anonymous tip can be rendered sufficiently reliable for purposes of a *Terry* stop: "There are many indicia of reliability respecting anonymous tips that we have yet to explore in our cases." *Id.*, at 274-75, 120 S.Ct, 1380-81 (Kennedy J., concurring).

For example, if an unnamed caller with a voice which sounds the same each time tells police on two successive nights about criminal activity which in fact occurs each night, a similar call on the third night ought not to be treated automatically like the tip in the case now before us. In the instance supposed, there would be a plausible argument that experience cures some of the uncertainty surrounding the anonymity, justifying a proportionate police response. In today's case, however, the State provides us with no data about the reliability of anonymous tips. Nor do we know whether the dispatcher or arresting officer had any objective reason to believe that the tip had some particular indicia of reliability.

[Similarly, i]f an informant places his anonymity at risk, a court can consider this factor in weighing the reliability of the tip. . . .

Instant caller identification is [also] widely available to police, and, . . . squad cars can be sent within seconds to the location of the telephone used by the informant. Voice recording of telephone tips might, in appropriate cases, be used by police to locate the caller. It is unlawful to

Defendant Fonville claims that his case "mirrors" that of *J.L.* and since the "only information that the officers received from the dispatcher was that an individual wearing a red jacket at the Elks Lodge supposedly had a gun," as in *J.L.*, the gun that the officers found in his pocket should be suppressed. [Defendant's, p. 8.]

Contrary to Defendant's assertion, although it is close, his case is not quite the "mirror image" of *J.L.* he wants the Court to believe it is.

The 911 caller's information that the dispatcher conveyed to the deputies here was not only that there was an individual in a red jacket at the Elks Lodge who might have a gun but also that the individual was one among some 200 people causing a disturbance in the Lodge, some of whom were physically fighting. *See* Government Response Brief, Ex. A. Furthermore, the 911 "tip" here was not entirely anonymous -- the dispatch transmitted to the officers contained a "call back" number. Although Defendant argues that this number was provided by the 911 system's caller ID, and, therefore, cannot be used to render the 911 call sufficiently reliable for purposes of *Terry*, Defendant apparently is unaware of the Supreme Court's decision last year in *Navarette v. California*, 134 S.Ct. 1683 (2014).

In *Navarette*, a 911 caller reported being run off the road by a certain colored car

---

make false reports to police, and the ability of the police to trace the identity of anonymous telephone informants may be a factor which lends reliability to what, years earlier, might have been considered unreliable anonymous tips.

*Id.* at 275-76.

and gave plate number.  The car and driver were located by police a while later.  Upon

approaching the car, the officers smelled marijuana.  Accordingly, they searched the

driver and the glove box of the car, where they discovered marijuana.  The driver was

then prosecuted on drug charges.  His motion to suppress the evidence was denied and

the Supreme Court affirmed.

With respect to the reliability of the 911 call, in addition to determining that the

caller had reported "eyewitness" information, the Court had this to say:

> Another indicator of veracity is the caller's use of the 911 emergency
> system. . . . A 911 call has some features that allow for identifying and
> tracing callers, and thus provide some safeguards against making false
> reports with immunity. *See J. L.*[529 U.S.] at 276, 120 S.Ct. 1375
> (KENNEDY, J., concurring). As this case illustrates . . . , 911 calls can be
> recorded, which provides victims with an opportunity to identify the false
> tipster's voice and subject him to prosecution, *see, e.g.*, Cal.Penal Code
> Ann. § 653x (West 2010) (makes "telephon[ing] the 911 emergency
> line with the intent to annoy or harass" punishable by imprisonment and fine);
> *see also* § 148.3 (2014 West Cum. Supp.) (prohibits falsely reporting "that
> an 'emergency' exists"); § 148.5 (prohibits falsely reporting "that a felony
> or misdemeanor has been committed"). The 911 system also permits law
> enforcement to verify important information about the caller.  In 1998, the
> Federal Communications Commission (FCC) began to require cellular
> carriers to relay the caller's phone number to 911 dispatchers.  47 CFR §
> 20.18(d)(1) (2013) (FCC's "Phase I enhanced 911 services" requirements).
> Beginning in 2001, carriers have been required to identify the caller's
> geographic location with increasing specificity. §§ 20.18(e)-(h) ("Phase II
> enhanced 911 service" requirements). And although callers may ordinarily
> block call recipients from obtaining their identifying information, FCC
> regulations exempt 911 calls from that privilege. §§ 64.1601(b), (d)(4)(ii)
> ("911 emergency services" exemption from rule that, when a caller so
> requests, "a carrier may not reveal that caller's number or name"). None of
> this is to suggest that tips in 911 calls are *per se* reliable. **Given the
> foregoing technological and regulatory developments, however, a
> reasonable officer could conclude that a false tipster would think twice**

**before using such a system. The caller's use of the 911 system is therefore one of the relevant circumstances that, taken together, justified the officer's reliance on the information reported in the 911 call.**

134 S.Ct. at 1690 (some internal citations omitted; emphasis added).

It bears noting that in *J.L.,* there is nothing indicating that the "anonymous call" received by the Miami-Dade police in that case came in through the 911 system. All that is said in that case is that "an anonymous caller reported to the Miami-Dade Police that a young black male standing at a particular bus stop and wearing a plaid shirt was carrying a gun." 529 U.S. at 268, 12 S.Ct. at 1377. Furthermore, the events in *J.L.* occurred in 1995 -- even private caller ID was not prevalent at the time, let alone the 911 technology in place now.

Among the factors that the *Navarette* Court found significant with respect to the reliability of the 911 call in that case were (1) the caller's apparent eyewitness knowledge of an allegedly dangerous activity; (2) that the call was placed soon after the caller perceived the event, and (3) that the caller used the 911 system. 134 S.Ct. at 1689-90. We have all three of these factors present here. First, there is indicia that the 911 caller was likely an "eyewitness" to a potentially dangerous event -- the caller said that there was an ongoing disturbance at the Elks' Lodge where "people are fighting" and where one of the subjects had a gun. [*See* dispatch screen shot, Government's Response Brief, Ex. A.] The caller also stated that the people "are refusing to leave." *Id.* These statements suggest that the caller reporting the disturbance likely was a employee or other

19

person in the building trying to get the people to leave -- in other words, the caller was an "eyewitness" inside the building witnessing the ongoing disturbance.  Second, the call was made while the disturbance was in progress.  ("People are fighting" and "are refusing to leave." *Id.*)  Third, the caller used the 911 system.

*J.L.* had none of these factors.  The essence of *J.L.* was that there were three teenagers standing at a bus stop in broad daylight and an anonymous caller who said that one of the three, who was wearing a plaid shirt, had a gun.  Three teenagers standing around at a bus stop in broad daylight does not equate with 200 people fighting and causing a disturbance inside a bar at 1:00 a.m., i.e., near closing time, with one of the participants in the disturbance possibly being armed.  The fact that no fighting was observed in the Elks' parking lot and the crowd inside had begun to disburse by the time the deputies arrived "does not strip the 911 report of either its reliability or of its emergency nature."  *United States v. Williams*, 731 F.3d 678, 685 (7th Cir. 2013).

For all of these reasons, the Court is persuaded that there are sufficient indicia of reliability in the 911 call in this case for the Court to consider the call among the totality of facts and circumstances within the officers' knowledge in assessing whether the officers had a reasonable articulable suspicion of Defendant's involvement in criminal activity.

Other circumstances further distinguish this case from *J.L.*  In *J.L.*, when the police arrived at the bus stop, one of the officers immediately accosted the plaid-clad

20

teenager, ordered him to put his hands above his head, and then, without any questioning,

introduction or other discussion, proceeded to frisk him and seized a gun from his pocket.

There was no colloquy between J.L and the officer before he was frisked.  J.L. did not

make any furtive moves or attempt to hide his weapon; he did not try to

flee -- the officer simply went up to J.L. and ordered him to put his hands up and

promptly searched him.  By contrast, in this case, upon the arrival of the deputies on the

scene, Fonville was not immediately ordered to submit to a search of his person.  Deputy

Wallace engaged (or attempted to engage) Fonville in a colloquy, and it was only after he

attempted hide his weapon and tried to flee from the officers that he was subjected to a

pat-down search.   According to the officers, by this time, they had smelled alcohol on

Fonville, had witnessed him stumbling and slurring his words, and witnessed his furtive

moves and his attempts to conceal the right side of his body.  As all of these actions

occurred *before* Fonville's seizure, the Court can consider them -- along with the

information from the 911 call -- in determining whether the deputies had a reasonable

articulable suspicion of criminal behavior to justify the search.

Having so considered these actions, the Court concludes that, under the totality of

circumstances, the facts of which the deputies by then had knowledge -- i.e., the

information from the 911 call and their observations of Defendant Fonville, including his

attempt to get away from them, tensing up and trying to conceal the front and right side

of his body -- together with all inferences that may be drawn from those facts, provided

them with a sufficiently "reasonable articulable suspicion" of criminal conduct to justify an investigative stop and pat-down search.  All of these facts gave rise to a reasonable suspicion that Fonville might be carrying a weapon.[4]  "Furtive movements made in response to police presence may contribute to an officer's suspicions" that the subject is armed.  *Id.* (citing *United States v. Edmunds*, 240 F.3d 55, 61 (D.C. Cir. 2001); *United States v. Caruthers*, 458 F.3d at 466 (police may validly consider an individual's furtiveness).  "Nervous, evasive behavior is a pertinent factor in determining reasonable suspicion."  *Illinois v. Wardlow*, 528 U.S. 119, 124, 120 S.Ct. 673 (2000).  Headlong flight is not required.  *United States v. Lowe*, 791 F.3d at 433 (citing *United States v. Waterman*, 569 F.3d 144 (3d Cir. 2009).  Furthermore, as the stop was weapons-related, it was reasonable for the officers to handcuff Fonville for safety reasons while they searched his person.  *See Caruthers, supra* (securing the defendant while officers searched for weapons was least intrusive reasonable means available to conduct a *Terry* search).  Moreover, Fonville's own testimony confirms the officers' suspicion:  he admitted that he was attempting to flee from the officers and tried to conceal the fact that he had a gun:  "I was drunk.  I was on parole.  I had a pistol and I knew I couldn't have a gun.  That's why I was trying to get away."

---

[4]  It is a crime under Michigan law for any person to "carry, have in possession or under control" any firearm when that person is under the influence of alcohol, a controlled substance, or a combination of both.  M.C.L.§ 750.237(1)(a).  Carrying a *concealed* weapon while one is intoxicated is also expressly prohibited.  *See* M.C.L. § 28.425k(2).

For all of the foregoing reasons, the Court concludes that, under the totality of the facts and circumstances, the deputies had reasonable articulable suspicion of criminal conduct to justify an investigative stop and pat-down search of Defendant Fonville. Accordingly, the Court concludes that the deputies' stop and detention of Fonville on the scene in handcuffs, and the ensuing search of Fonville's person were proper.

<u>CONCLUSION</u>

For all of the reasons set forth in this Opinion and Order,

IT IS HEREBY ORDERED that Defendant's Motion to Suppress Evidence **[Dkt. # 16]** is DENIED.


s/Gerald E. Rosen
Chief Judge, United States District Court

Dated:  September 9, 2015

I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on September 9, 2015, by electronic and/or ordinary mail.


s/Julie Owens
Case Manager, (313) 234-5135